

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-24-00150-CV

---

TAC Total Automation Controls, INC., TAC Insumos Industriales,
S. De R.L. De C.V., Carlos Pablo Lara Elias, and Luis Ernesto Martinez Ontiveros, Appellants

v.

MSC Industrial Supply, S. De R.L. De C.V. and MSC Import Export LLC, Appellees

---

On Appeal from the 34th District Court
El Paso County, Texas
Trial Court No. 2023-DCV1459

---

## SUBSTITUTED MEMORANDUM OPINION

We withdraw our opinion and judgment of June 30, 2025, and substitute the following opinion and corresponding judgment in their place. Appellants' motion for rehearing is denied.

Appellees MSC Industrial Supply, S. De R.L. De C.V. and MSC Import Export LLC (the MSC entities) filed a lawsuit against Appellants TAC Total Automation, Inc., Tac Insumos

Industriales, S. de R.L. de C.V., Carlos Pablo Lara Elias and Luis Ernesto Martinez Ontiveros (collectively TAC) for allegedly breaching a noncompete clause in the parties' contracts. After the lawsuit was pending for approximately a year, TAC filed a motion to compel arbitration based on an arbitration agreement in one of the parties' contracts. In the trial court, the MSC entities argued that (1) the arbitration agreement was not valid or enforceable; and (2) TAC substantially invoked the judicial process to their detriment and therefore waived the right to seek arbitration. After the trial court denied the motion, TAC appealed. Based on the totality of the circumstances, we conclude TAC substantially invoked the judicial process to the MSC entities' detriment prior to moving to compel arbitration. We affirm on that basis.

## I. FACTUAL BACKGROUND

### A. The parties' operations

TAC Total Automation, Inc. (TAC Inc.) is a Texas corporation formed in 2005 with Appellants Luis Ernesto Martinez Ontiveros (Martinez) and Carlos Pablo Lara Elias (Lara) as its principal shareholders. The company purchases and imports industrial supplies and products from overseas suppliers and sells said products to its customers. TAC Insumos Industriales, S. de R.L. de C.V. (TAC Insumos) was formed in 2011 by Lara and Martinez, as its principal members, to distribute products imported by TAC Inc. and provide it logistics services. Lara and Martinez are TAC Insumos's principal members. Among other things, TAC Insumos assumed most of TAC Inc.'s operations and maintained its client list. Although the TAC entities sold products and services to customers in the U.S., their primary market was in Mexico.

MSC Import Export LLC (MSC Import) is a Delaware corporation based in New York, which imports and sells similar industrial supplies in the U.S. Its related entity, MSC Industrial Supply, S. De R.L. De C.V (MSC Mexico), is similarly in the business of distributing industrial

2

supplies and provides logistics services for the MSC entities' industrial customers in Mexico and the U.S.

### B.   The 2018 purchase agreement

In October 2018, MSC Mexico and TAC Insumos, together with TAC Insumos's parent company[1] and its principal members, Lara and Martinez, entered into a written contract in which MSC Mexico purchased certain assets from TAC Insumos, including its customer lists and outstanding purchase orders, with the option to later purchase additional assets (the 2018 Purchase Agreement). The 2018 Purchase Agreement provided for a $13,564,000 total purchase price subject to a final valuation at closing. TAC Insumos was the payee of a $4,750,000 promissory note related to the transaction, with MSC Mexico as payor. The purpose of the 2018 Purchase Agreement was to give MSC Mexico a foothold in the Mexican market. As part of the transaction, Lara purchased a 25% shareholder interest in both MSC Import and MSC Mexico for $2,800,000 by way of a promissory note and was made an MSC Mexico board member.

The 2018 Purchase Agreement contained a "non-competition clause" providing that the seller would not "directly or indirectly, engage or have an interest anywhere in Mexico, or any other country" in terms of selling or marketing products or services in the conduct of the "Covered Business" as defined in the agreement. Pursuant to the 2018 Purchase Agreement, at closing, the seller would execute various documents, including "non-competition agreements," in the form attached as Exhibit A to the agreement. However, it does not appear that any such agreements were executed at that time.

The 2018 Purchase Agreement also contained the arbitration agreement at issue:

12.3 <u>Arbitration.</u> Except as otherwise provided in this Agreement, the following binding dispute resolution procedures shall be the exclusive means used to

---

[1] The parent company is not a party to this appeal.

resolve all disputes, differences, controversies and claims arising out of or relating to the Agreement or the transactions contemplated hereby (collectively "Disputes").

(a) All disputes arising out of or in connection with this Agreement shall be submitted to the *Centro de Arbitraje de Mexico* ("CAM") and shall be finally settled under the Rules of Arbitration of CAM.

Both Lara and Martinez signed the 2018 Purchase Agreement as members of TAC Insumos and its parent company in October 2018.

### C.   The 2019 Amendment No. 1 and noncompete agreements

In February 2019, the same parties signed "Amendment No. 1" to the 2018 Purchase Agreement making changes to the closing date and the customer lists. Amendment No. 1 did not change the purchase price, and it indicated that "all terms and conditions of the Purchase Agreement shall remain in full force and effect." It provided that various sections, including "[s]ection 12.3 (Arbitration) . . . of the Purchase Agreement shall apply *mutatis mutandis* to this Amendment No. 1.[2] Once again, both Lara and Martinez signed the agreement as members of TAC Insumos and its parent company.

The same day they signed Amendment No. 1, Lara and Martinez signed separate noncompete agreements prohibiting them from directly or indirectly engaging in actions that would compete with MSC Mexico's business for a specified period of time. The noncompete agreements contained a penalty provision calling for $3.1 million in liquidated damages in the event of a breach and a right on the part of MSC Mexico to exercise any legal action to remedy a breach. In contrast with the terms of the 2018 Purchase Agreement, the noncompete agreements each contained the following forum selection clause: "Any legal action or proceeding arising out

---

[2] In its pleadings, MSC defined *mutatis mutandis* as "changed according to circumstances; with the necessary changes," quoting BALLENTINE'S LAW DICTIONARY (3d ed. 1969).

4

of or relating to this Agreement may be brought in any Texas court or federal court of the United States of America sitting in Texas, or any federal court sitting in the city of Chihuahua, Chihuahua, Mexico."

### D. The 2021 Amendment No. 2 and noncompete agreements

On July 23, 2021, the parties entered into "Amendment No. 2" in which MSC Mexico acquired additional fixed assets from TAC Insumos, customer lists for the logistics business it was still operating, and hiring rights to most of its workforce. MSC Mexico agreed to pay an additional $6,718,987 for TAC Insumos's logistics services in Mexico, subject to a final valuation at closing.

Similar to the 2018 Purchase Agreement, Amendment No. 2 contained a noncompete provision and contemplated that, at closing, TAC Insumos would provide MSC Mexico signed noncompete agreements virtually identical to the other two Lara and Martinez signed in 2019. It further provided: "Except as amended or otherwise clarified by this Amendment No. 2, all terms and conditions of the Purchase Agreement and Amendment No. 1, shall remain in full force and effect." Again, it provided that the arbitration clause in section 12.3 of the 2018 Purchase Agreement "shall apply *mutatis mutandis*." Amendment No. 2 was signed by both Lara and Martinez as members of TAC Insumos and its parent company. Unlike the prior two agreements, which called for Steve Armstrong's signature, MSC Mexico's senior vice-president and general counsel, Amendment No. 2 was signed by Sandra Ruiz as a "Member of the Board of Managers and Attorney in Fact."

On July 26, 2021, Lara and Martinez signed two additional noncompete agreements as required by Amendment No. 2. These were similar to the 2019 agreements but had additional restrictions and different enforceability dates. The liquidated damages penalty was set at $1,343, 797.40. Both noncompete agreements again provided that MSC Mexico could take any legal action

5

for a breach in addition to the penalty provision. They also contained the following forum selection clause: "Any legal action or proceeding arising out of or relating to this Agreement may be brought in any Texas court or federal court of the United States of America sitting in Texas, or any federal court sitting in the city of Chihuahua, Chihuahua, Mexico."

## II. PROCEDURAL BACKGROUND

### A. The MSC entities file their lawsuit

On May 4, 2023, MSC Mexico and MSC Import filed a petition and application for injunctive relief, naming all of the TAC defendants, including Lara and Martinez, alleging, among other things, that they were in breach of contract for violating the noncompete agreements in the parties' contracts; that they tortiously interfered with the MSC entities' contractual relationships with their customers; that they breached their fiduciary duties; and that they engaged in civil conspiracy. The MSC entities filed two amended petitions on May 12, 2023, raising similar allegations, and further asserting that the noncompete agreements were governed by their forum selection clauses allowing the lawsuit to be filed in a Texas court.[3] The MSC entities sought over $2.2 million as damages for the breaches as well as a temporary restraining order, a temporary injunction, and a permanent injunction prohibiting TAC from engaging in any future conduct that would violate their agreements.

### B. TAC files their answer, a counterclaim, and a third-party complaint

TAC's June 5, 2023 answer to the MSC entities' second amended petition raised several affirmative defenses, including unclean hands, accord and satisfaction, waiver, estoppel and

---

[3] The MSC entities attached a declaration from Sandra Ruiz, an MSC Mexico board member and custodian of records, explaining the parties' relationship and attaching the four noncompete agreements signed by Lara and Martinez in 2019 and 2021.

laches. In addition, TAC filed a counterclaim against the MSC entities and a third-party complaint against Sid Tool Company (Sid Tool) alleging Sid Tool was related to the MSC entities, doing business in Texas as MSC Industrial Supply Company. According to TAC, the MSC entities and Sid Tool had approached them for the purpose of entering into a business relationship, allegedly making false representations that fraudulently induced them into signing the various agreements at issue, and subsequently defaulted on their financial obligations to them. TAC claimed that the MSC entities also engaged in actions that wrongfully "destroyed" their business operations and led to stock devaluation. Among other things, TAC alleged that MSC Mexico was engaging in a "conspiracy" in which it "wrongfully branded" as much as $1,800,000 of products using TAC Insumos's registered trademark; "ordered the manufacture of approximately $10,000,000 of wrongfully branded product for sale"; improperly used TAC Inc.'s and TAC Insumos's credit accounts, logos, and trade names; and used their credit cards to pay vendors, all of which was being done without their consent.

In their counterclaim, TAC brought causes of action against the MSC entities and Sid Tool for fraud, fraudulent inducement, conspiracy to commit fraudulent inducement, and unjust enrichment. They sought actual damages in excess of $20 million; exemplary damages in an amount to be determined by the court pursuant to the Texas Civil Practices and Remedies Code; and attorneys' fees pursuant to Chapter 37 of the Texas Civil Practices and Remedies Code. They further sought a judgment declaring that the noncompete agreements were unenforceable, or in the alternative, declaring the parties' duties, responsibilities, and obligations under those agreements. TAC also demanded a jury trial "on the merits," averring that they had tendered the jury fee.

7

**C. Trial court proceedings before TAC filed their motion to compel arbitration**

As explained in more detail below, TAC filed their motion to compel arbitration on May 9, 2024, over a year after the MSC entities initially filed suit, citing the arbitration provisions in the parties' 2018 Purchase Agreement and its amendments. The MSC entities opposed the motion on two grounds. First, they argued the arbitration provisions in the 2018 Purchase Agreement and amendments were superseded by the dispute resolution provisions in the noncompete agreements, which provided for resolution in a court of law. Second, they maintained that, even if the arbitration provisions applied, TAC impliedly waived its right to seek arbitration by substantially invoking the judicial process to the MSC entities' detriment prior to filing its motion. Because our focus is on the latter argument, we provide a brief overview of the trial court proceedings prior to the filing.

As TAC notes, much of the trial court activity focused on the MSC entities' application for a temporary restraining order and temporary injunction to restrain TAC from continuing to engage in conduct the MSC entities claimed was violating their agreements. The trial court held its first hearing on the motion for a temporary restraining order in May 2023 and thereafter granted the motion. The MSC entities then filed an application for a temporary injunction. Following a June 2023 hearing, the court granted the application enjoining TAC Inc. from contacting the MSC entities' customers, from competing with them, and from using their confidential or trade secret information. The trial court found that the MSC entities had asserted valid causes of action, established a probable right to relief, and faced the "threat of imminent, irreparable harm . . . by the loss of customers, vendors, suppliers, goodwill, and prospective customers" if the court did not issue the temporary injunction.

On June 27, 2023, TAC filed a motion to dissolve the temporary restraining order and temporary injunction maintaining they had not been given notice of the hearings, which were held

8

without their participation. Although the record does not contain a ruling on TAC's motion, on June 30, 2023, the trial court held another hearing on the application for temporary injunction at which attorneys for both sides were present. At the hearing, Sandra Ruiz testified that she was a longtime employee who also sits on MSC Mexico's board. After describing the parties' relationships and their various agreements, which were admitted in evidence, she explained that the MSC entities had hired a Mexican notary to investigate whether any of the TAC defendants were violating the noncompete agreements. Ruiz and the notary both testified that during the investigation, the notary documented instances in which it appeared that one of the TAC companies or a related entity was conducting business with customers in Mexico that were on the customer list MSC Mexico had purchased from TAC Insumos.[4]

The trial court did not rule on TAC's request for a temporary injunction, and after resetting the matter twice, the court appointed a retired judge in August 2023 to rule on the request and hear the remainder of the case. The retired judge held three status conferences in September and October with counsel for both parties present. At an October status conference, TAC's attorney asserted that the MSC entities had been "actively defrauding" Lara and Martinez and were "violating [TAC's] trademarks [by] manufacturing millions of dollars of merchandise under a trademark . . . they [didn't] have a right to." He also asserted that there were 20 other lawsuits pending in Mexico involving the parties, and that TAC had a "sense of urgency" in having the MSC entities' application set for hearing. At this same status conference, TAC's attorney asserted that TAC could be ready for trial as early as August 2024. The court set the temporary injunction hearing for November 6, 2023.

---

[4] Among other things, the MSC entities introduced a photograph the notary had taken of a truck with a TAC logo on it at the location of a business on the customer list.

In the interim, both parties engaged in discovery, including taking the depositions of Lara and Martinez, making requests for production of documents, and making other discovery requests going in both directions. On October 23, 2023, days before the scheduled hearing on the temporary injunction request, TAC filed an emergency motion to compel discovery, contending they had served document production requests on September 12, 2023, but the MSC entities' responses were insufficient to allow TAC to prepare for the upcoming injunctive relief hearing. On October 24, 2023, TAC filed an emergency motion seeking to continue the November 3rd temporary injunction hearing, contending the requested documents, which had not been produced, were needed for the hearing. In their motion, TAC explained that they had requested documents pertaining to their counterclaim regarding the MSC entities' alleged fraud and misuse of TAC Insumos's trademark, and that they needed the documentation to support their position that the MSC entities had unclean hands and were not entitled to equitable relief. Following an October 27, 2023 hearing, the trial judge reset the temporary injunction hearing to November 6, 2023. In the interim, the MSC entities produced over 4,000 pages of documents to TAC, some of which related to TAC's counterclaim that the MSC entities were misusing TAC Insumos's trademark.

Following at least seven hearings from November 6 to December 29, 2023,[5] the judge entered an order dated January 5, 2024, granting the MSC entities' application for a temporary injunction against TAC, using virtually identical language to the court's earlier order. The judge found that the MSC entities had "asserted valid causes of action, [had] a probable right to relief, and faced the threat of imminent, irreparable harm" from TAC's conduct, concluding that in the absence of temporary injunction, the MSC entities would be "irreparably injured by the loss of customers, vendors, suppliers, goodwill, and prospective customers." The judge further found that

---

[5] The parties did not provide the reporter's records of any of the hearings.

the MSC entities had "no adequate remedy at law other than issuing a Temporary Injunction." After denying the TAC's motion to dissolve the injunction, the judge issued an amended order on February 16, 2024, in which it set an August 19, 2024 trial date.

In anticipation of the trial date, the parties entered into an agreed scheduling order, which, among other things, set a June 21st deadline for completing "fact discovery" and a May 10th deadline for designating expert witnesses and submitting expert witness reports. On May 7, 2024, the parties entered into a Rule 11 agreement extending the deadline to designate expert witnesses and file expert witness reports to May 24, 2024.

**D. Trial court proceedings after TAC filed their motion to compel arbitration**

The week after filing its motion to compel arbitration, on May 16, 2024, TAC moved to continue the trial date, arguing that due to the protracted proceedings regarding the MSC entities' request for temporary injunctive relief, they did not have time to conduct merits-based discovery. TAC maintained that they could not engage in such discovery or file dispositive motions until the motion to compel arbitration was resolved, as they did not want to appear as if they were waiving arbitration. After the MSC entities objected to continuing the trial date, on June 4, 2025, the judge denied TAC's continuance request but extended the discovery deadline and dispositive motion deadline from June 21 to August 2, 2024.

On May 30, 2024, the parties entered into a second Rule 11 agreement to extend the deadline for designating expert witnesses and filing expert witness reports from May 24, 2024, to May 31, 2024. The MSC entities designated their two expert witnesses and filed their expert witness reports on the deadline. The first report, which included multiple charts and graphs, was prepared by Steven Hart, an accounting expert who addressed the alleged losses the MSC entities suffered as the result of TAC's conduct. He estimated lost profits of over ten million dollars and a

11

diminished business value of over 17 million dollars from 2021 through the date of the report. The second report was prepared by Mark Osborne, a local attorney who estimated that the MSC entities had incurred $831,480 in attorneys' fees for the litigation to date. His report included the attorneys' billing records and invoices dating back to April 2023.

### E. The MSC entities' argument that TAC waived their right to compel arbitration

In opposing TAC's motion to compel arbitration, the MSC entities argued that TAC impliedly waived their right to arbitration by their litigation conduct. They argued TAC was aware of the arbitration provisions prior to filing suit—as Lara and Martinez had signed the contracts—yet allowed the litigation to continue for approximately a year before moving to compel arbitration. Moreover, they noted the following: TAC made affirmative requests for relief and requested a jury trial and paid the jury fee; TAC engaged in extensive discovery, some of which TAC initiated, which resulted in the MSC entities producing 4,337 pages of documents and TAC producing 3,420 pages of documents; TAC participated in the depositions of Lara and Martinez; TAC participated in multiple hearings regarding the requests for temporary restraining order; and TAC engaged in status conferences in which they discussed trial dates and discovery deadlines. The MSC entities further posited that TAC strategically waited until approximately three months before the August 19th trial setting to file their motion to compel, and only did so after receiving an adverse ruling on the temporary injunction request and missing significant discovery deadlines. They maintained they would be unfairly prejudiced if the matter went to arbitration by having to relitigate the temporary injunctive relief issue, giving TAC "second bite at the apple" after they received the unfavorable ruling from the trial court. The MSC entities argued they were prejudiced by incurring approximately a million dollars in attorneys' fees and costs during the litigation.

In support of their opposition, the MSC entities attached the parties' contracts and noncompete agreements; TAC's answer, counterclaim, and third-party complaint; the parties' Rule 11 agreements; a chart of pending cases in the Mexican courts involving litigation between the parties they claimed TAC Insumos had initiated; and an excerpt from one of the temporary injunction hearings at which the MSC entities claimed TAC's counsel sought affirmative relief by orally requesting an injunction.[6]

### F. TAC's reply to the MSC entities' arguments

TAC filed their reply in support of their motion to compel arbitration on May 31, approximately 15 minutes before the hearing on the motion started, denying they substantially invoked the judicial process and arguing the MSC entities did not establish prejudice by TAC's delay in moving to compel arbitration. TAC argued that although they filed a counterclaim and third-party claim, they did not file any dispositive motions seeking a ruling on their claims. They contended that the parties had only engaged in limited discovery, virtually all of which centered on the temporary injunction rather than on the "merits" of the parties' claims. TAC also argued the MSC entities failed to establish they were prejudiced by the amount of discovery conducted because the discovery would be "useful" in arbitration. TAC further posited that the MSC entities would not be required to relitigate their entitlement to a temporary injunction, as they believed the injunction would stay in place during the pendency of the arbitration proceedings. In addition, TAC argued that the MSC entities failed to present evidence that they incurred a million dollars in legal fees, and regardless, the fees incurred were "largely self-inflicted" during their protracted quest for a temporary injunction.

---

[6] At the hearing, TAC's counsel stated: "If the Court is considering granting an injunction against Mr. Martinez, Mr. Lara and TAC Insumos, I would ask that the Court grant an injunction against the Plaintiffs, not permitting them to use any form of trademark [including the] TAC Global Solutions trademark."

Moreover, TAC took issue with the exhibits attached to the MSC entities' opposition, maintaining they were not authenticated, and the trial court should therefore not consider them. Finally, TAC argued that the MSC entities failed to preserve the argument that TAC waived their right to arbitrate, contending Texas Rule of Civil Procedure 94 required them to raise the "waiver" argument as an "affirmative defense" in their pleadings.[7]

### G. The MSC entities' post-trial supplement (the Third Supplement)

The hearing on TAC's motion to compel arbitration was held on May 31, 2024, and the MSC entities thereafter filed a third supplement to their opposition to the motion on June 5, 2024 (the Third Supplement). The MSC entities preemptively sought to excuse their late filing by noting they were responding to the arguments in TAC's reply, which was filed only 15 minutes before the May 31st hearing in which TAC first objected to their exhibits. The MSC entities attached several new exhibits, including an affidavit from one of their attorneys authenticating their exhibits, including those previously filed; a certification from the court reporter authenticating the excerpt from the temporary injunction hearing; their two expert reports previously served on TAC; TAC's supplemental response to MSC's request for production of documents; TAC's supplemental response to their interrogatories asking TAC to state the basis of their counterclaim for damages in which TAC alleged that the MSC entities' "fraudulent" actions in "conspiring to utilize [TAC's] business operations and assets and Trademark without paying consideration" caused them over 11 million dollars in damages; TAC's October 23rd emergency motion to compel discovery; and a declaration from TAC's attorney verifying the authenticity of the list of cases pending in the Mexican court system.

---

[7] Texas Rule of Civil Procedure 94 states "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . waiver, and any other matter constituting an avoidance or affirmative defense." Tex. R. Civ. P. 94.

On June 6, TAC objected to the Third Supplement and its exhibits as being untimely filed, noting the supplement was filed after the hearing and without leave of court. The MSC entities responded, contending that most of the documents could be found in the court's own records of which the judge could take judicial notice, and regardless, the judge had the discretion to consider the remaining exhibits as they were filed before the judge ruled on the motion to compel arbitration.

## H. The trial judge's rulings

On June 13, 2024, the trial judge issued its order overruling TAC's objections to the admission of the Third Supplement. However, the judge sustained TAC's objection that the MSC entities waived their right to claim TAC substantially invoked the judicial process because they failed to raise "waiver" in their answer. The same day, without providing reasons, the judge denied TAC's motion to compel arbitration.[8]

TAC appealed, and this Court stayed the trial court's proceedings pending the appeal.

## III. ISSUES ON APPEAL

On appeal, TAC maintains the trial court erred in denying their motion to compel because (1) the arbitration provision in the contract between MSC Mexico and TAC Insumos governed the parties' dispute, and (2) TAC did not substantially invoke the judicial process to the MSC entities' detriment.

Assuming without deciding that the arbitration provision in the contract governed the parties' dispute, we conclude TAC substantially invoked the judicial process to the MSC entities'

---

[8] The next day, TAC filed an emergency motion to extend the deadline for filing their expert witness reports. They argued that the parties' focus on injunctive issues gave them "little time to focus on the merits of the case" or adequately conduct discovery in preparation for trial. That same day, TAC designated their expert witnesses and provided a summary of their proposed testimony but did not file expert witness reports.

detriment; accordingly, we address that issue and that issue alone. *See Rivas v. Molina*, No. 08-23-00102-CV, 2024 WL 647656, at *3 (Tex. App.—El Paso Feb. 15, 2024, pet. denied) (mem. op.) (recognizing that court may address the dispositive question first in its analysis) (citing Tex. R. App. P. 47.1).

Relevant to TAC's claim that they did not substantially invoke the judicial process to the MSC entities' detriment, we consider TAC's two underlying arguments: (1) that the MSC entities waived their right to claim TAC substantially invoked the judicial process by failing to plead it in accordance with Rule 94; and (2) that the trial court erred by refusing to strike MSC's exhibits and by considering the exhibits in ruling on the motion.

## IV. STANDARD OF REVIEW

In an interlocutory appeal of an order denying a motion to compel arbitration, we apply an abuse-of-discretion standard. *See Wagner v. Apache Corp.*, 627 S.W.3d 277, 283 (Tex. 2021). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or acts without reference to guiding rules or principles. *Lucchese, Inc. v. Rodriguez*, 388 S.W.3d 354, 361 (Tex. App.—El Paso 2012, no pet.) (citing *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007)). "A trial court has no 'discretion' in determining what the law is or applying the law to the facts." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). Thus, although we defer to the trial court's factual determinations if they are supported by the evidence, we review the court's legal rulings *de novo*. *See Henry*, 551 S.W.3d at 115.

This Court reviews the trial court's decision denying a motion to compel arbitration in light of the grounds presented in the trial court by the party resisting arbitration. *Cardwell v. Whataburger Rests., L.L.C.*, 484 S.W.3d 426, 428 (Tex. 2016). This Court may uphold the trial

16

court's decision on any appropriate legal theory urged below. *See F.T. James Constr., Inc. v. Hotel Sancho Panza, LLC*, 657 S.W.3d 623, 629 (Tex. App.—El Paso 2022, no pet.).

## V. APPLICABLE LAW

Arbitration is a contractual proceeding by which the parties, to obtain a speedy and inexpensive final disposition of disputed matters, consent to submit the controversy to arbitrators for resolution. *See In re Phelps Dodge Magnet Wire Co.*, 225 S.W.3d 599, 605 (Tex. App.—El Paso 2005, no pet.) (citing *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992)). Because arbitration rights are contractual in nature, there is a "strong presumption against waiver of arbitration"; therefore, "a party asserting a waiver has a high hurdle to overcome." *Hogg v. Lynch, Chappell & Alsup, P.C.*, 480 S.W.3d 767, 780 (Tex. App.—El Paso 2015, no pet.). Although there is a strong presumption against waiver of arbitration, it is rebuttable. *Perry Homes v. Cull*, 258 S.W.3d 580, 584 (Tex. 2008).

Like any other contractual right, arbitration can be waived if the parties agree to resolve a dispute in court. *Id.* A party may waive its right to arbitration either expressly, through a clear repudiation of the right, or impliedly, "through conduct inconsistent with a claim to the right." *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 511 (Tex. 2015). "A party's conduct sufficiently demonstrates intent to waive a right if, in light of the 'surrounding facts and circumstances,' it is 'unequivocally inconsistent with claiming' that right." *LaLonde v. Gosnell*, 593 S.W.3d 212, 219 (Tex. 2019).

A party opposing the enforcement of a valid arbitration agreement based on waiver bears the burden of proving the defense. *Royston, Rayzor, Vickery & Williams, LLP v. Lopez*, 467 S.W.3d 494, 499–500 (Tex. 2015). On appeal, the question of whether a party's litigation conduct

17

implicitly waives its right to compel arbitration is a question of law, which we review *de novo*. *In re Serv. Corp. Int'l*, 85 S.W.3d 171, 174 (Tex. 2002) (orig. proceeding).

## VI.  THE TRIAL COURT PROPERLY CONSIDERED THE THIRD SUPPLEMENT

Before addressing whether the MSC entities met their burden of establishing waiver, we first ascertain what evidence we may consider. TAC contends that we cannot consider the documents contained in the Third Supplement due to the MSC entities' failure to timely file the supplement prior to the trial court's hearing on TAC's motion. We disagree.

In resolving a motion to compel arbitration, a trial court "summarily decide[s] whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations." *See Tipps*, 842 S.W.2d at 269; *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (recognizing that a trial court conducts a summary proceeding to determine the applicability of an arbitration clause) (citing Tex. Civ. Prac. & Rem. Code Ann. § 171.021 (b)). This summary procedure is essentially the same procedure used in resolving a motion for partial summary judgment and is "subject to the same evidentiary standards." *Kmart Stores of Tex., L.L.C. v. Ramirez*, 510 S.W.3d 559, 565 (Tex. App.—El Paso 2016, pet. denied) (quoting *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 208 (Tex. App.—El Paso 2004, orig. proceeding)).

The procedural rules relevant to summary judgment proceedings provide: "Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response." Tex. R. Civ. P. 166a(c). In applying this rule to proceedings that resolve motions to compel arbitration, a trial court has broad discretion to admit late-filed evidence upon "leave of court" even after the conclusion of a hearing on the motion. *See Wright v. Hernandez*, 469 S.W.3d 744, 755 (Tex. App.—El Paso 2015, no pet.); *see also Grant v. Espiritu*, 470 S.W.3d 198, 203 (Tex. App.—El Paso 2015, no pet.) (although the Rules of Civil

18

Procedure provide for strict deadlines for filing responses and supporting evidence, Rule 166a(c) allows a trial judge to admit late-filed evidence upon "leave of court"). We will uphold a trial court's decision to permit the filing of late-filed evidence absent an abuse of discretion. *Wright*, 469 S.W. 3d at 755–56.

Here, TAC appears to concede that if the MSC entities had sought leave of court to file their Third Supplement as required by Rule 166a, the trial court would have had the discretion to grant the request. But TAC contends that because the MSC entities failed to seek or obtain a written order granting leave of court prior to filing their supplement, the trial court erred by overruling their objections and by presumably considering the exhibits in denying TAC's motion to compel. TAC contends we are also prohibited from considering the exhibits in our analysis. We disagree.

Contrary to TAC's argument, Rule 166a does not require an adverse party to file a formal motion for leave to file a late response to a summary judgment. Nor does it require the trial court to file a formal written order granting such leave. To the contrary, "[p]ermission to file a response late may be reflected in a separate order, a recital in the summary judgment, or an oral ruling contained in the reporter's record of the summary judgment hearing." *Wright*, 469 S.W.3d at 755. And "leave of court is presumed when a summary judgment states that all pleadings were considered, . . . the record does not indicate that an amended pleading was not considered, and the opposing party does not show surprise."[9] *B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 261–62 (Tex. 2020).

Here, we consider two factors in determining that the trial court impliedly granted the MSC entities permission to file their late supplement. First, we note that the trial court

---

[9] TAC does not contend they were surprised by the MSC entities' late filing, nor could they, as the exhibits attached to the Third Supplement were documents already on file with the trial court or already exchanged in discovery.

19

expressly overruled TAC's motion to strike the supplement as untimely filed.[10] *See City of Dallas v. Cont'l Airlines, Inc.*, 735 S.W.2d 496, 500–01 (Tex. App.—Dallas 1987, writ denied) (where trial court denied motion to strike late-filed supplemental brief and attached documents, court would "presume that leave of court was granted to file" them); *see also B.C.*, 598 S.W.3d at 261–62 (holding that where a party objected to the timeliness of the opposing party's response, but "neither sought nor obtained a ruling on that objection before or after the trial court's order," the court had "no basis to conclude the trial court did not consider all summary-judgment evidence on file at the time the motion was heard").

Second, in its final order denying TAC's motion to compel arbitration, the trial court stated that it was denying TAC's motion after considering "TAC's motion, Plaintiffs' responses in opposition, the evidence and pleadings on file, and argument of counsel." We construe this as an affirmative showing that the trial court intended to impliedly grant the MSC entities' leave of court to file their Third Supplement in opposition to TAC's motion and further intended to rely on the Third Supplement in determining whether TAC waived their right to arbitrate. *See B.C.*, 598 S.W.3d at 261–62 ("[b]ecause the trial court recited [in its final judgment] that it had considered 'the pleadings, evidence, and arguments of counsel,'" the court of appeals should have considered that evidence as well in its review of the trial court's

---

[10] We note that at least one of our sister courts has held that a trial court's order denying a motion to strike late-filed evidence, standing alone, "does not equate to granting leave to file evidence late." *Tex. Windstorm Ins. Ass'n v. Dickinson Indep. Sch. Dist.*, 561 S.W.3d 263, 272 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (citing *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 619 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ("trial court's denial of motion to strike is not equivalent of leave to file contested evidence")). But here, we do not consider the trial court's decision to deny TAC's motion to strike the Third Supplement in isolation; instead, we consider this factor in conjunction with the language the trial court used in its final order denying the motion to compel arbitration. *See Yeske v. Piazza Del Arte, Inc.*, 513 S.W.3d 652, 672–73 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (recognizing that trial court's failure to grant appellees' motion to strike a late-filed amended petition could be a factor in determining whether the trial court considered it in its decision to grant summary judgment).

grant of summary judgment); *see also Wright*, 469 S.W.3d at 755 ("when an 'affirmative' showing is made that the trial court granted leave of court, late-filed pleadings and evidence will be deemed to have been properly filed and considered by the trial court").

Finally, we reject TAC's argument that they were prejudiced because they did not have a chance to address the "shortcomings" in the supplemental exhibits since they were filed after the hearing. TAC had the opportunity to challenge the exhibits before the trial court issued its ruling on the motion to compel arbitration, and in fact did so, albeit unsuccessfully, when they filed objections.

Accordingly, we consider the MSC entities' Third Supplement's exhibits in our analysis.

## VII.  RULE 94 DID NOT REQUIRE THE MSC ENTITIES TO RAISE THE WAIVER ISSUE IN A PLEADING

We next consider TAC's argument that the MSC entities waived their right to argue that TAC had substantially invoked the judicial process due to their failure to raise the issue in a formal pleading. In taking this position, TAC relies on Texas Rule of Civil Procedure 94, which states: "In pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense." Tex. R. Civ. P. 94. TAC further notes, "[i]f an affirmative defense or avoidance is not expressly pleaded, the party cannot rely on the defense as a bar to liability." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 155 (Tex. 2015). According to TAC, the MSC entities' claim that TAC waived their right to arbitrate constituted an "affirmative defense" or a "matter constituting an avoidance" under Rule 94, and because the MSC

21

entities did not raise the claim in its pleadings, they could not rely on it in opposing TAC's motion to compel arbitration.[11]

TAC, however, has not cited any authority, nor are we aware of any, to support the application of Rule 94 to the MSC entities' claim that TAC waived their right to arbitrate. Rule 94's purpose in requiring that an affirmative defense or a matter in avoidance be pleaded "is to give the opposing party notice of the defensive issue to be tried." *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014). Under Rule 94, an affirmative defense or a matter in avoidance is one on which a party relies "as a bar to liability." *Zorrilla*, 469 S.W.3d at 155. Here, whether TAC waived-their right to compel arbitration is not a "defensive issue to be tried," nor does it stand as a "bar to liability." Instead, it simply requires the parties to resolve their dispute in a different forum.

Moreover, as our sister court has highlighted, Rule 94 only requires a party "'[i]n pleading to a preceding pleading,' to 'set forth affirmatively' its affirmative defenses." *Albertson's Holdings, LLC v. Kay*, 514 S.W.3d 878, 885 (Tex. App.—Tyler 2017, no pet.) (citing Tex. R. Civ. P. 94). A motion to compel arbitration is "not the functional equivalent of a pleading." *Id.* (citing *Rupert v. McCurdy*, 141 S.W.3d 334, 339 (Tex. App.—Dallas 2004, no pet.)). Accordingly, we conclude that the MSC entities were not required to respond to TAC's motion to compel arbitration

---

[11] TAC points out that the trial court appears to have agreed with their argument when it ruled that it was sustaining TAC's Rule 94 objection. Based on the court's own ruling, TAC argues, the trial court should not have considered the MSC entities' waiver argument. In turn, TAC urges us to abide by the trial court's ruling on that issue. We decline to do so. When, as here, a trial court makes an erroneous interim ruling or gives a wrong reason for a ruling, an appellate court is not bound by the incorrect ruling in determining whether the trial court's judgment is otherwise correct. *See In re Estate of Hutchins*, 391 S.W.3d 578, 585 (Tex. App.—Dallas 2012, no pet.) (recognizing that an appellate court may overlook an error in a trial court's ruling if the trial court otherwise "reached the correct result" in its judgment) (citing *Guaranty Cnty. Mut. Ins. Co. v. Reyna*, 709 S.W.2d 647, 648 (Tex. 1986) (per curiam) (recognizing that an appellate court "must uphold a correct lower court judgment on any legal theory before it, even if the court gives an incorrect reason for its judgment.")).

with a formal pleading, and that, instead, their opposition to the motion was sufficient to preserve their waiver argument.[12] *Id.* (concluding that the plaintiffs' response to the defendants' motion to compel arbitration raising the "defense" that the arbitration agreement was unconscionable was sufficient to preserve their argument); *see also Shamrock Foods Co. v. Munn & Associates, Ltd.*, 392 S.W.3d 839, 844–45 (Tex. App.—Texarkana 2013, no pet.) (recognizing that Rule 94 did not govern party's response to a motion to compel arbitration and that party properly responded by filing a response to the motion); *Pounds v. Rohe*, 592 S.W.3d 549, 555 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (holding that trial court could consider plaintiff's argument in response to defendant's motion to compel arbitration that defendant substantially invoked the judicial process even though it was raised for the first time at a hearing on the defendant's motion).

## VIII.  WHETHER TAC WAIVED THEIR RIGHT TO COMPEL ARBITRATION

Finally, we turn to the merits of TAC's argument that the trial court erred in denying their motion to compel arbitration. Under Texas law, the MSC entities had the burden of establishing: (1) that TAC substantially invoked the judicial process by engaging in conduct that was inconsistent with their right to compel arbitration; and (2) that TAC's inconsistent conduct caused the MSC entities to suffer detriment or prejudice.[13] *G.T. Leach*, 458 S.W.3d at 511–12 (citing *Perry Homes*, 258 S.W.3d at 593–94). We consider each prong separately.

---

[12]  We recognize that TAC amended their answer to the MSC entities' petition the same day they filed their motion to compel arbitration to include an assertion that the claims were "barred due to the compulsory arbitration provision contained in the 2018 Purchase Agreement" and its amendments, and that the parties were therefore "required to arbitrate all claims arising out of or relating to said agreements in Mexico" with the CAM arbitrators. However, TAC has cited no authority for the proposition that the MSC entities were required to respond to the amended petition's assertion that the parties' dispute was subject to arbitration, where the MSC entities adequately addressed the issue in their opposition to the motion to compel.

[13]  The MSC entities point out that the United States Supreme Court recently held that "prejudice is not a condition of finding that a party, by litigating too long, waived its right to stay litigation or compel arbitration under the [Federal Arbitration Act]." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022). TAC acknowledges that the Federal

23

## A. Did TAC substantially invoke the judicial process?

Whether a party substantially invoked the judicial process depends on the totality of the circumstances. *Id.* at 512. We decide the issue case-by-case taking into consideration a multitude of nonexclusive factors promulgated by the Texas Supreme Court, including:

- whether the party who pursued arbitration was the plaintiff or the defendant;
- how long the party who pursued arbitration delayed before seeking arbitration;
- when the party who pursued arbitration learned of the arbitration clause's existence;
- how much the pretrial activity related to the merits rather than arbitrability or jurisdiction;
- how much time and expense has been incurred in litigation;
- whether the party who pursued arbitration sought or opposed arbitration earlier in the case;
- whether the party who pursued arbitration filed affirmative claims or dispositive motions;
- how much discovery has been conducted and who initiated the discovery;
- whether the discovery sought would be useful in arbitration;
- what discovery would be unavailable in arbitration;
- whether activity in court would be duplicated in arbitration;
- when the case was to be tried; and
- whether the party who pursued arbitration sought judgment on the merits.

*Id.* All of the factors are rarely presented in a single case; waiver can be established based on only a few or even the existence of a single one. *Id.*

### (1) TAC's knowledge of the arbitration provision and their one-year delay in moving for arbitration

Courts have found that a party's delay, standing alone, does not support a finding that the party moving to compel arbitration substantially invoked the judicial process to the opposing party's detriment. *See, e.g.*, *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 763 (Tex. 2006). Nevertheless, courts have found that delays in the range of one-year, or even less, can be a factor

---

Arbitration Act applies to the parties' dispute but points out that Texas still appears to follow the rule pronounced in *Perry Homes* requiring a showing of prejudice to establish a waiver. *See F.T. James Constr., Inc. v. Hotel Sancho Panza, LLC*, 657 S.W.3d 623, 635 (Tex. App.—El Paso, 2022, no pet.) (acknowledging the Court's opinion in *Morgan* but applying Texas law requiring a finding of prejudice before determining that a party waived its right to enforce an arbitration agreement). Accordingly, for purposes of this appeal, we will assume, without deciding, that the Court's opinion in *Morgan* did not abrogate the rule in Texas requiring a showing of prejudice in determining whether a party waived its right to compel arbitration, and we therefore analyze prejudice out of an abundance of caution.

in determining whether a party waived its right to compel arbitration, particularly when the party knew of the existence of the arbitration agreement during the period of delay. *See, e.g.*, *Adams v. StaxxRing, Inc.*, 344 S.W.3d 641, 649 (Tex. App.—Dallas 2011, pet. denied) (finding that party waived its right to compel arbitration where the uncontroverted evidence established that he knew of the arbitration provision in the parties' contract from the start of litigation, yet delayed 13 months to bring a motion to compel); (finding that party waived its right to arbitration where it unequivocally knew of its right to invoke an arbitration provision yet delayed an additional four months while engaging in ongoing litigation before it moved to compel); *Menger v. Menger*, No. 01-19-00921-CV, 2021 WL 2654137, at \*5 (Tex. App.—Houston [1st Dist.] June 29, 2021, no pet.) (mem. op.) (finding party's six-month delay before requesting arbitration was a factor in determining waiver, where the party "knew about the arbitration clause long before he filed his motion to compel arbitration"); *see also Perry Homes*, 258 S.W.3d at 596 (finding waiver where party delayed request for arbitration fourteen months after filing suit despite initially opposing arbitration).

Here, TAC does not deny that they knew of the arbitration clause from the inception of the litigation, and because both Lara and Martinez signed the contracts containing the arbitration provision, we will presume they were aware of the provisions at that time. *See F.T. James Constr.*, 657 S.W.3d at 633 (presuming that a party, particularly a sophisticated one with equal bargaining power, who had the opportunity to read a contract containing an arbitration agreement and signed the contract "knows its contents") (citing *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996)). Yet they admittedly delayed a full year to file their motion to compel arbitration after the MSC entities filed suit.

25

TAC seeks to explain their delay by noting that the MSC entities had already moved for both a temporary restraining order and temporary injunction before TAC entered their appearance. TAC appears to be arguing that they had to wait to file their motion to compel arbitration until after the trial court fully resolved the question of whether the MSC entities were entitled to such relief. In making this argument, TAC relies on Texas Civil Practice and Remedies Code section 171.086(a)(6), which provides, "[b]efore arbitration proceedings begin, in support of arbitration a party may file an application for a court order, including an order to . . . obtain other relief, which the court can grant in its discretion, needed to permit the arbitration to be conducted in an orderly manner and to prevent improper interference or delay of the arbitration." Tex. Civ. Prac. & Rem. Code Ann. § 171.086 (a)(6). According to TAC, this provision not only gave the MSC entities the right to seek a temporary injunction in the trial court prior to the case being submitted to arbitration, but also required TAC to allow the injunction proceedings to go forward to their conclusion before they could file their motion to compel arbitration. We disagree.

Section 171.086(a) only applies to situations in which arbitration proceedings have not yet begun, allowing the parties to seek court orders necessary to preserve their rights until the arbitration begins, including orders to preserve evidence and any other orders needed to "permit the arbitration to be conducted in an orderly manner and to prevent improper interference or delay of the arbitration." Tex. Civ. Prac. & Rem. Code Ann. § 171.086 (a)(1–6). But here, neither party sought orders under this statute, and more importantly, nothing in the statute would have required TAC to wait to move to compel arbitration until the trial court resolved MSC's request for temporary injunctive relief. Nor are we aware of any other authority that would have required TAC to wait to file their motion to compel arbitration until after the trial court ruled on MSC's request.

Accordingly, we conclude that TAC's knowing and unexcused one-year delay in filing for arbitration is a factor weighing in favor of a finding that they waived their right to arbitration.

**(2)  TAC's defendant status and their filing of affirmative claims for relief**

We next consider the status of the various parties. TAC points out that they did not initiate the litigation, and their status as defendants weighs against a finding that they invoked the judicial process. *See F.T. James Constr.*, 657 S.W.3d at 631 (recognizing that when party moving for arbitration is the defendant, that is a factor weighing against a waiver finding). However, in their first responsive pleading to the MSC entities' petition, TAC filed a counterclaim against MSC and a third-party complaint against Sid Tool. We recognize that, in general, when a party files a mandatory or compulsory counterclaim that is defensive in nature and does not seek affirmative relief, it is not considered a factor in favor of finding that the party invoked the judicial process. *See Hogg*, 480 S.W.3d at 786 (citing *G.T. Leach Builders*, 458 S.W.3d at 512–13 (recognizing that because party's counterclaim was defensive in nature and did not seek affirmative relief, it was not indicative of a party's intent to waive its right to arbitration)). But when a party seeks affirmative relief in a counterclaim or a third-party petition, we may consider it to be a significant factor in finding that the party substantially invoked the judicial process. *Id.*; *see also F.T. James Constr.*, 657 S.W.3d at 631 (recognizing that filing a counterclaim and third-party petition seeking affirmative relief is "contrary to a desire to arbitrate" and is conduct that "invoke[s] the jurisdiction of the court and of the judicial process"); *Zurvita Holdings, Inc. v. Jarvis*, No. 05-23-00661-CV, 2024 WL 1163209, at *13 (Tex. App.—Dallas Mar. 14, 2024, pet. abated) (mem. op.) (filing both counterclaims and third-party actions seeking affirmative relief can support a finding of waiver of arbitration).

Here, TAC's counterclaim and third-party complaint sought affirmative relief from the trial court, seeking an award of both actual and exemplary damages for independent causes of action, including TAC's claims that the MSC entities and Sid Tool engaged in fraudulent conduct, breached the parties' agreements, were improperly using TAC's trademarks and/or tradenames and their credit accounts without permission, and were actively destroying TAC's businesses. As well, in their pleadings, TAC sought a declaration regarding the parties' rights under the various agreements. As our sister court has noted, requesting a declaratory judgment is a significant factor in determining that a party has invoked the judicial process because a declaratory judgment is "designed" to "put to rest the question of [the] rights between the parties" in a judicial proceeding. *RSL Funding, LLC*, 424 S.W.3d at 684; *see also Hogg*, 480 S.W.3d at 786 (noting that defendant's filing of an affirmative claim seeking a declaratory judgment and the imposition of a constructive trust were important factors in finding that the defendant substantially invoked the judicial process) (citing *Ellman v. JC Gen. Contractors*, 419 S.W.3d 516, 521 (Tex. App.—El Paso 2013, no pet.) (finding that appellants substantially invoked the judicial process by, among other things, raising affirmative claims for relief in which they requested a declaratory judgment)).

Moreover, TAC requested a jury trial on their affirmative claims for relief and stated that they had paid a jury fee. While requesting a jury trial does not, standing alone, require us to find that TAC invoked the judicial process, it is a significant factor we may consider in determining whether TAC acted in a manner that was inconsistent with their right to arbitrate. *See Sedillo v. Campbell*, 5 S.W.3d 824, 827–28 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (finding party's actions in filing a counterclaim, requesting a jury trial, and paying a jury fee were factors inconsistent with the right to arbitrate) (citing *Nationwide of Bryan, Inc. v. Dyer*, 969 S.W.2d 518, 522 (Tex. App.—Austin 1998, no pet.) (noting that requesting a jury trial is inconsistent with the

28

right to arbitrate)); *see also In re MONY Sec. Corp.*, 83 S.W.3d 279, 285 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) (noting that party's payment of jury fee was "inconsistent with its right to arbitrate").

Finally, contrary to TAC's argument, the fact that they did not file any dispositive motions or seek judgment on any of their claims does not preclude us from finding that TAC's affirmative requests for relief in their pleadings were inconsistent with exercising a right to arbitrate. *See generally Perry Homes*, 258 S.W.3d at 592 (holding that the trial court erred by concluding that a party who sought affirmative relief in the trial court did not invoke the judicial process solely because it did not ask the court to "make any judicial decisions on the merits of its case"). As the Texas Supreme Court has recognized, "[w]aiver involves substantial invocation of the judicial *process*, not just judgment on the merits." *Id*. (emphasis in the original).

Accordingly, we conclude that TAC's filing of their counterclaim and third-party claim seeking affirmative relief in the trial court supports a finding that they substantially invoked the judicial process.

### (3)   Participation in discovery and other pretrial proceedings

We next consider whether TAC's participation in discovery and other pretrial proceedings are factors establishing the invocation of the judicial process. TAC acknowledges having engaged in discovery during the one-year period that the lawsuit was pending, but they maintain that their primary focus in doing so was to defend against the MSC entities' request for a temporary injunction, and that the discovery was not "merits-based." Therefore, TAC contends, their engagement in discovery was not inconsistent with their right to arbitrate. We find this argument without merit for multiple reasons.

First, though it has been said that to find waiver by engaging in pretrial activities, the pretrial activities must have been merits-based, this statement pertains to distinguishing between pretrial activities that relate to the merits of the case rather than activities relating to "arbitrability or jurisdiction." *Perry Homes*, 258 S.W.3d at 591; *see also Hogg*, 480 S.W.3d at 787 (recognizing that in evaluating whether a party acted inconsistently with the right to arbitrate, courts should consider whether the party filed pretrial pleadings and other documents addressing the merits of the parties' claims or whether they only addressed issues of "arbitrability or jurisdiction"). Here, the discovery conducted did not relate to either arbitrability or jurisdiction.

Second, that the discovery requested and produced was primarily directed toward the temporary injunction hearing does not mean the discovery was not "merits-based." To the contrary, a request for a temporary injunction necessarily involves issues going directly to the merits of the moving party's substantive claims. While the purpose of a temporary injunction is primarily to preserve the status quo, granting a temporary injunction is an "extraordinary remedy"; and to be entitled to such relief, an applicant "must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916–17 (Tex. 2020) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)). The MSC entities sought both monetary and permanent injunctive relief in their pleadings on their various causes of action; therefore, any discovery directed at their "probable right to the relief sought" would necessarily relate to the merits of the parties' dispute.[14] *See*

---

[14] The elements required to establish entitlement to a permanent injunction are substantially similar to the elements required to establish entitlement to a temporary injunction. *See Huynh v. Blanchard*, 694 S.W.3d 648, 674 (Tex. 2024) (recognizing that "[t]o be entitled to a permanent injunction, a party must prove (1) a wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law") (quoting *Pike v. Tex. EMC Mgmt., LLC*,

*Courtright v. Allied Custom Homes, Inc.*, 647 S.W.3d 504, 519 (Tex. App.—Houston [1st Dist.] 2022, pet. denied) (mem. op.) (recognizing that discovery that was in part related to the plaintiff's request for a temporary injunction was merits-based, as the plaintiff was required to establish a probable right to recovery to obtain the injunction); *Zurvita Holdings*, 2024 WL 1163209, at *12 (recognizing that party's request for a temporary injunction and its activities relevant to its request could be considered "merits activity" for purposes of determining whether the party invoked the judicial process).

In addition, the MSC entities' discovery requests and responses did not relate solely to their request for injunctive relief. Instead, as explained above, during discovery, the MSC entities sought information regarding TAC's allegation that they suffered 11 million dollars in damages due to MSC's allegedly wrongful conduct as set forth in TAC's counterclaim. And the MSC entities further provided information to TAC regarding their claim for damages, including their expert witness reports, which detailed the financial losses the MSC entities had allegedly suffered to date. Moreover, TAC made several statements in the trial court acknowledging that they were seeking information directly relating to the parties' dispute, including information to support their counterclaim that the MSC entities were improperly using TAC Insumos's trademark to their financial detriment.[15]

---

610 S.W.3d 763, 792 (Tex. 2020)). As TAC appears to recognize in their prejudice analysis, any discovery relating to the issue of the MSC entities' entitlement to a temporary injunction would therefore be relevant to the ultimate issue of whether they would be entitled to a permanent injunction.

[15] For example, in complaining that the MSC entities were not being responsive to their request for production of documents, TAC's counsel sent their counsel letters stating that TAC's request was "relevant to the dispute between the parties" and "directly relevant to the prosecution or defense of their claims or defenses." In their motion to compel discovery, TAC similarly categorized their request as "directly relevant to the prosecution or defense of [the parties'] claims or defenses." And in their motion to continue the temporary injunction hearing, TAC asserted they had made numerous requests to the MSC entities to produce "documentation specifically related to the unauthorized use of [TAC Insumos's] trademark," in support of their counterclaim against the MSC entities.

Finally, TAC contends we should not consider their discovery involvement as a waiver factor, as the discovery conducted was "minimal" and primarily initiated by the MSC entities. We disagree. TAC initiated discovery on the merits of both the MSC entities' claims and their own counterclaims. While the record does not contain copies of all the parties' requests for discovery or their responses, we can nevertheless discern from the record that the parties engaged in a substantial amount of discovery before TAC moved to compel arbitration. *See Hogg*, 480 S.W.3d at 89 (finding that although the record on appeal did not include copies of all of the parties' discovery requests and responses, court could nevertheless determine by the parties' representations in their pleadings that a substantial amount of discovery had taken place). By TAC's own admissions in their pleadings and briefing, the parties produced thousands of pages of documents, answered interrogatories, participated in at least three or four depositions, and produced discovery relevant to the expert witnesses they intended to use at trial. While the parties may have needed to engage in additional discovery, we may assume they were well into the discovery process, as only three months remained until trial when TAC filed their motion to compel arbitration.[16] *Hogg*, 480 S.W.3d at 789 (recognizing that although parties did not conduct "full" discovery, they engaged in substantial discovery and "were likely nearing the end of the discovery proceedings" when the motion to compel arbitration was filed).

We also find it significant that prior to moving to compel arbitration, TAC's counsel attended several status hearings, beginning in September 2023, in which the parties discussed

---

[16] TAC does not specify exactly what discovery remained to be conducted in the three months prior to trial, and instead generally contends in their briefing that they did not have a chance to conduct any depositions due to their focus on defending against the request for a temporary injunction. But both parties were conducting ongoing discovery throughout the pretrial proceedings, and there is no evidence that TAC was prevented from conducting depositions or other discovery during this time.

issues relating to trial settings and scheduling orders; agreed to an August 2023 trial date and signed a joint scheduling order; and signed a Rule 11 agreement extending the deadlines for conducting pretrial discovery. We have previously recognized that engaging in such pretrial activities, although not dispositive, demonstrates "an intent to have the parties' dispute resolved in a judicial setting rather than through arbitration." *Hogg*, 480 S.W.3d at 786–87 (recognizing that party's filing of numerous pretrial pleadings in which she requested a jury trial, agreed to trial settings, and signed a Rule 11 agreement to deposit funds in the court's registry pending trial evidenced an intent to have the parties' dispute resolved in a judicial setting rather than through arbitration).

Accordingly, we conclude that TAC's participation in discovery and other pretrial proceedings is a factor supporting a finding that they substantially invoked the judicial process.

### (4) The timing of TAC's motion

Finally, we agree with the MSC entities' argument that by waiting to file their motion to compel arbitration until after they received an unfavorable ruling from the trial court on the temporary injunction issue, TAC's actions were "more consistent with a 'late game tactical decision' than a true intent to preserve the right to compel arbitration." *See Hogg*, 480 S.W.3d at 789–90 (finding that a party engaged in improper gamesmanship by willingly participating in a protracted discovery battle then moving for arbitration after she received an adverse ruling from the trial court requiring her to produce certain recordings she claimed were privileged and only after being threatened by the opposing party that it would seek sanctions for her noncompliance); *see also Accord Bus. Funding, LLC v. Ellis*, 625 S.W.3d 612, 619 (Tex. App.— Houston [14th Dist.] 2021, no pet.) (recognizing that party cannot seek to gain a "tactical advantage" by attempting to switch forums after receiving an adverse ruling in the trial court); *BBX Operating,*

33

*LLC v. Am. Fluorite, Inc.*, No. 09-17-00245-CV, 2018 WL 651276, at *6 (Tex. App.—Beaumont Feb. 1, 2018, no pet.) (mem. op.) ("[A] party who is aware of an arbitration clause, yet only files a motion to compel arbitration after having engaged in discovery and filed pleadings with the trial court, and after having received an adverse ruling from a trial court, has substantially invoked the litigation process and thereby waived its right to arbitrate."). As our sister court has recognized, "[w]aiting to seek arbitration until after receiving an adverse ruling on the merits in litigation is perhaps the clearest type of conduct that is inconsistent with the right to arbitrate." *Pounds*, 592 S.W.3d at 556 (citing *PRSI Trading Co. v. Astra Oil Trading*, No. 01-10-00517-CV, 2011 WL 3820817, at *4 (Tex. App.—Houston [1st Dist.] Aug. 25, 2011, pet. denied) (mem. op.)).

We conclude that by willingly participating in litigation for almost a year, and only moving to switch forums when it became clear that their case was not proceeding in a favorable matter, TAC was in effect seeking a way to press the reset button to avoid the consequences of their choice to litigate. *See Hogg*, 480 S.W.3d at 791. Moreover, waiting until three months before trial when TAC knew of the arbitration provisions since the suit was filed a year earlier speaks to their choice to litigate and weighs against compelling arbitration. *See Rivas*, 2024 WL 647656, at *4 (recognizing that "waiting until the eve of trial to seek arbitration is an especially weighty factor [in applying] the multi-factor test") (citing *Perry Homes*, 258 S.W.3d at 584).

Accordingly, we conclude that the overall weight of these factors establishes that TAC substantially invoked the judicial process prior to moving to compel arbitration. We next turn to whether the MSC entities established prejudice from this invocation.

**B. Were the MSC entities prejudiced by TAC's invocation of the judicial process?**

The question of whether a party has been prejudiced by the opposing party's invocation of the judicial process refers to the "'inherent unfairness caused by a 'party's attempt to have it both

34

ways by switching between litigation and arbitration to its own advantage.'" *G.T. Leach Builders*, 458 S.W.3d at 515 (quoting *In re Citigroup Global Mkts., Inc.*, 258 S.W.3d 623, 625 (Tex. 2008) (per curiam)). Such inherent unfairness may be manifested "in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Perry Homes*, 258 S.W.3d at 599. In general, the nonmovant must show the fact of prejudice, but not its extent. *Id*. Thus, a nonmovant need only prove substantial invocation of the judicial process that caused prejudice, not precisely how much it cost. *Id*. at 599–60.

Here, we find that the MSC entities furnished undisputed evidence to support a finding that they incurred significant costs due to TAC's delay in seeking arbitration. As explained above, they presented documentation showing they had incurred $831,480 in legal fees from the inception of the lawsuit in May 2023 through April 2024.[17] While we view costs in relative terms based on the magnitude of the particular case before us, courts have found prejudice based on evidence that the nonmoving party incurred far less in attorneys' fees and costs during a period of delay. *See, e.g.*, *Zurvita Holdings*, 2024 WL 1163209, at *13 (finding prejudice where nonmoving party's attorney represented that the fees and expenses totaled more than $300,000 in prosecuting and defending claims by and against the opposing parties prior to their arbitration demand); *GRGP, Inc. v. Black Forest Holdings, Inc.*, No. 01-23-00314-CV, 2023 WL 8459522, at *6 (Tex. App.—Houston [1st Dist.] Dec. 7, 2023, no pet.) (mem. op.) (finding attorney's affidavit attesting that his client had

---

[17] Even without this precise documentation, the trial court could have inferred from the record before it that the MSC entities incurred substantial expenses during the period of delay given the nature of the discovery conducted and the number of hearings held. *See Ellman v. JC Gen. Contractors*, 419 S.W.3d 516, 522 (Tex. App.—El Paso 2013, no pet.) (recognizing that a party opposing arbitration is not always required to prove the cost of extensive discovery or other pretrial activities in order to prove prejudice); *see also Rivas v. Molina*, No. 08-23-00102-CV, 2024 WL 647656, at *7 (Tex. App.—El Paso Feb. 15, 2024, pet. denied) (mem. op.) (recognizing that even though party opposing arbitration failed to provide evidence of expenses incurred while engaged in the litigation process and pretrial preparation, "these activities [were] plainly not without costs and expense").

incurred $279,613 in fees prior to the opposing party's arbitration demand supported a finding of prejudice) (citing *Adams*, 344 S.W.3d at 651 (finding evidence showing that plaintiffs had incurred $110,000 in legal fees, which included $21,000 in fees solely for the purpose of responding to defendant's discovery requests and motions, was sufficient to support a determination of prejudice)).

TAC, however, contends the fees incurred by the MSC entities were largely "self-inflicted," i.e., occasioned by their desire to obtain a temporary injunction, and should thus not be considered in our prejudice analysis. In general, fees and costs that are "largely self-inflicted" bode against a finding of prejudice. *See In re Vesta Ins. Group, Inc.*, 192 S.W. 3d at 763 (finding nonmoving party's attorneys' fees and costs were largely self-inflicted where "he sent far more discovery requests than he received, and amended his petition at least eleven times"). But as explained above, the litigation involving the MSC entities' right to a temporary injunction went to the very heart of their case, and as the trial court found, an injunction was necessary to protect them from imminent harm caused by TAC's actions prior to trial. Therefore, we cannot say that the MSC entities' quest for injunctive relief was "self-inflicted." In addition, as explained above, the MSC entities incurred substantial costs in requesting and responding to discovery that related directly to the merits of the parties' claims, including the production of their expert witness reports.

TAC retorts that regardless of the fees and costs the MSC entities incurred in the trial court litigation, they failed to show they were prejudiced as (1) they have not shown that the discovery produced in the trial court would not be "useful" in arbitration proceedings, and (2) the temporary injunction issued by the trial court would remain in place during the pendency of the arbitration proceedings. We are unpersuaded by this argument.

We recognize that, in general, if the discovery produced in the trial court prior to an arbitration demand would be useful in arbitration, this weighs against a finding of prejudice. *See In re Bruce Terminix Co.*, 988 S.W.2d at 704; *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 578 n.3 (5th Cir. 1991). Here, however, we have no way of determining whether the discovery produced would be useful in arbitration. The arbitration agreement itself contains no provisions specifying the type or nature of discovery allowed in the arbitration proceedings. *See Zurvita Holdings*, 2024 WL 1163209, at *14 (finding it significant in assessing prejudice that the arbitration agreement did not "specify that discovery conducted in the lawsuit can be utilized in arbitration without the necessity for duplication of the written discovery and depositions") (citing *Ideal Roofing, Inc. v. Armbruster*, No. 05-13-00446-CV, 2013 WL 6063724, at *8 (Tex. App.— Dallas Nov. 18, 2013, no pet.) (mem. op.) (finding it significant in analyzing prejudice that the parties' arbitration agreement did not describe the nature of discovery that would be permitted in the arbitration proceedings without the necessity for duplication)). More importantly, we have no way of determining whether the discovery produced in a Texas court proceeding would be "useful" or even admissible in an arbitration proceeding to be conducted by the *Centro de Arbitraje de Mexico* (CAM) as required by the arbitration agreement.

Similarly, contrary to TAC's contention, we have no way of knowing whether the CAM arbitrators would allow the trial court's temporary injunction to remain in place during the pendency of the arbitration proceedings or whether the MSC entities would be forced to relitigate that issue at additional expense. As the MSC entities point out, the arbitration agreement gives the CAM arbitrators the right to "award any remedy or relief including . . . the issuance of . . . precautionary measures," thereby arguably giving them the right to reconsider this issue.

Finally, we note that prejudice may be shown when the moving party "delayed disposition" of a case "by switching to arbitration when trial was imminent and arbitration was not." *Perry Homes*, 258 S.W.3d at 597. Here, after litigating in the trial court for almost a full year, TAC filed its motion to compel arbitration less than three months before the scheduled trial date, or in other words, when trial was imminent. As a result, the MSC entities have has been prejudiced by losing their trial date and the ability to have their claims heard in a timely manner. *See Zurvita Holdings*, 2024 WL 1163209, at *14 (concluding that the nonmoving party was prejudiced by the moving party's 11-month delay in filing its motion to compel arbitration, where it waited until trial was two months away to file the motion, thereby depriving the nonmoving party of the ability to have its claims heard in a timely manner). We therefore conclude that the MSC entities established they suffered prejudice by TAC's delay in filing their motion to compel arbitration.

Accordingly, we conclude that the record supports a finding that TAC substantially invoked the judicial process to the MSC entities' detriment and that they thereby waived their right to arbitration. Because this was one of the grounds raised by the MSC entities in the trial court in opposing TAC's motion to compel arbitration, we affirm the trial court's decision to deny the motion on that basis.

TAC's Issue Two is overruled.[18]

## IX. CONCLUSION

We affirm the trial court's order denying the motion to compel arbitration and remand to the trial court to conduct further proceedings in accordance with our opinion.

---

[18] Given our decision that TAC waived their right to compel arbitration, we need not address or resolve Issue One regarding whether the arbitration agreement applied to the parties' claims.

LISA J. SOTO, Justice

October 14, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.